**CENTENNIAL INSURANCE COMPANY,**
**Appellant,**

**v.**

**J. N. NUTT, Commissioner of Insurance**
**et al., Appellees.**

**No. 11419.**

Court of Civil Appeals of Texas.

Austin.

July 13, 1966.

Thompson, Coe, Cousins & Irons, I. L. Allen, Michael S. Knuths, Dallas, for appellant.

Waggoner Carr, Atty. Gen., Hawthorne Phillips, First Asst. Atty. Gen., T. B. Wright, Executive Asst. Atty. Gen., Paul W. Phy, Ralph R. Rash, Harry Gee, Jr., Asst. Attys. Gen., Austin, for appellees.

HUGHES, Justice.

This suit was brought by Centennial Insurance Company, appellant, against J. N. Nutt, Commissioner of Insurance of Texas, since resigned, members of the State Board of Insurance of Texas, and the Treasurer and Attorney General of Texas to recover taxes paid under protest, such taxes being premium taxes assessed against appellant under the provisions of Art. 7064, Vernon's Ann.Tex.Civ.St.

In a non-jury trial judgment was rendered that appellant take nothing by its suit.

The question presented is one of statutory construction. We are required to determine the meaning of the words "amount it had invested" as used in Art. 7064 as applied to the facts of this case, which will now be stated.

Appellant Centennial, a New York corporation, is a capital stock fire and casualty company wholly owned by Atlantic, a New York corporation, both of said companies having been licensed to do business in the State of Texas prior to the year 1956 and at all times since that date. On December 7, 1956, Atlantic effected a duly authorized contribution to the surplus account of Centennial by means of an intercorporate transfer of certain securities, including both "Texas securities" and securities which could not qualify as Texas securities under Article 7064. The greater part of the securities contributed were New York securities. The transfer by Atlantic was pursuant to Sections 351 and 362, Internal Revenue Code, 1954, as amended, a tax free contribution to the surplus of Centennial with no resulting gain or loss being recognized to the Atlantic. At the time of the transfer by Atlantic most of the securities transferred had a fair market value in excess of the original cost of the securities to the parent company, Atlantic.

In computing its 1963 premium tax appellant reported the amount it had invested in said Texas securities and non-Texas

securities which had been contributed to its surplus, at the original cost of such securities to the parent contributor, Atlantic. Using such cost basis of the securities as its investment in those securities for Texas gross premium tax purposes, Centennial claimed a premium tax rate for the year 1963 of 1.65% and paid its premium tax using that percentage.

The Commissioner of Insurance acting for the State Board of Insurance and the State of Texas took the position that the fair market value of the securities contributed to Centennial on the date of contribution in 1956 was the amount invested by Centennial in New York securities and Texas securities for the purpose of computing the premium tax rate under Art. 7064 and assessed a tax rate of 3.025% rather than 1.65%.

In the trial court appellant took the position that for purposes of Article 7064, the amount Centennial had invested in said New York and Texas securities was the initial cost basis of the parent contributor Atlantic or, alternatively, zero dollars and not the fair market value of the stocks on the date of contribution by Atlantic to Centennial.

The relevant portion of Art. 7064 reads:

"Each such insurance organization shall also report to the Board of Insurance Commissioners on or before the first day of March of each year, the amount that it had invested on the 31st of December, preceding, in Texas securities as defined herein and the amount that it had invested on said date in similar securities in the State in which it had its highest percentage of admitted assets invested, * * *"

The maximum tax levied on gross premiums by this statute is 3.85%, but provision is therein made for a reduced tax rate the basis of such reduction being the ratio between the amount invested by the taxpayer in Texas securities and the amount invested by it in non-Texas securities.

The purpose of these provisions is, of course, to encourage investment in Texas securities as defined by statute.

Appellant has six points of error but as we understand the record and the briefs the only question to be decided is the value to be attributed to the donated securities which value, under this record, is to be either (1) cost to the donor (2) fair market value at the date of donation or (3) cost to donee, zero; and that this question is one of law.

Appellant relies, primarily, upon an opinion of the Attorney General of Texas. This opinion, S–200, was given May 31, 1956, and held that in computing the annual tax under Art. 7064 that the book value of securities rather than its market value as of December 31st of the tax year should be used, the opinion using this language:

"It is our opinion that the terms 'the amount of such investments' and 'had invested' as used in Article 7064, supra, mean the initial amount of money or money's worth used to purchase the security. The express purpose of the Act is to encourage, by offering a lower tax rate, those insurance carriers subject to the Act to make investments in Texas securities. If the market value of the securities, which fluctuate in value, is to be used in the determination of the amount of investments, the purpose of the Act would in a measure be defeated, in that the insurance carriers would always be in doubt as to whether they had invested sufficient funds in Texas securities in order to receive the benefit of a lower tax rate. Market value fluctuates and the market value of securities is often a question of opinion. We believe that the Legislature intended the amount the insurance carriers 'had invested' to be a certain and fixed amount. In fact, the purchase price paid for a Texas security is in aid of the financial economy of the State. An increase in the market value of the security would inure to the benefit of the insurance carrier only.

To hold that the market value of a security determines the amount invested would lead to absurd results."

We agree with this opinion to the extent that the "Legislature intended the amount the insurance carriers 'had invested' in securities to be a certain and fixed amount," not subject to the rise and fall of the market. We are not convinced, however, that such opinion is decisive of this case. That case did not involve a donation of securities; ours does. That opinion involved only the cost of the securities to the taxpayer, not their cost to the transferor as well.

No one would question the extent of investment here if instead of donating the securities Atlantic had donated their market value to Centennial in cash and Centennial had immediately purchased the securities which it now has.

It is difficult to believe that the form of the transaction should have controlling effect.

Appellant also relies, by analogy, upon the Federal income tax rule which in determining the gain or loss in a sale of securities uses the initial cost as the basis. We believe this analogy inapposite. We are not here concerned with any gain or loss in the value of the donated securities.

Appellees rely upon the testimony of expert witnesses, one of whom testified:

"Well, I would say that as far as financial accounting generally, accounting and reporting generally, that it is well known and generally known that an asset received as a donation would be set up at the market value at the time of the donation."

Similar opinions were expressed by the other experts, and text book authority of similar import was cited by one witness.

The trial court made a finding of fact consistent with these opinions. We believe the strongest position taken by appellant is that since the securities were donated to it it had no investment in them. Appellees challenge the right of appellant to here rely upon this position because it was not relied upon in the protest filed by it under the protest statute. Art. 1.05, Title 122A, Taxation-General, V.T.C.S. We will not dwell upon this matter for the reason that assuming this contention to be properly presented we are of the opinion that the fair market value of the securities at the time of their acquisition by appellant and for which it paid no consideration is the criterion to be employed in ascertaining the proper tax rate under Art. 7064.

We base this decision primarily upon the testimony of the experts, alluded to above, which was accepted by the trial judge.

The parties concede that no authorities are to be found upon the question presented, nor have we found any.

The Court, in discussing the meaning of the word "income" in Trefry v. Putnam, 227 Mass. 522, 116 N.E. 904, L.R.A.1917F, 806, Mass., stated, "It is thus differentiated from capital or investment, which commonly means the amount of wealth which a person has on a fixed date."

We believe this meaning of the word investment is consonant with its use in Art. 7064. The statute makes no mention of the source of the capital invested in securities nor of the manner of its acquisition. These matters were of no apparent concern to the Legislature. What did matter was the ratio of securities held by the taxpayer between Texas securities and non-Texas securities. This was the scheme of the tax reducing formula. If a taxpayer owned non-Texas securities, the purpose of the statute was to encourage him to convert these securities into cash and buy Texas securities. This could be accomplished by the conversion of securities purchased at their fair market value as well as those acquired by gift.

We believe that the purposes of Art. 7064 can be better achieved by the adoption of the fair market value rule. Some of the

securities donated to appellant were acquired by the donor as long ago as 1920. Their value has increased. Conversely, appellees pose this illustration: If the original cost to the donor of securities later donated to its subsidiary was $10,000.00, and its fair market value at the date of the donation was $1,000.00, then it would be a little ridiculous to say that the subsidiary had invested $10,000.00 in such securities.

Appellees concede that the rule it supports may father manipulation of securities for tax reducing purposes under Art. 7064, but it nevertheless advocates adoption of such rule.

We are unable to detect error in the judgment of the trial court, failing which it is our duty to affirm. This we do.

Affirmed.